IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No. 05-cr-~~675~~-765 1 & 2 |
| | ) | |
| v. | ) | |
| | ) | HONORABLE DAVID H. COAR |
| ANTONIO FIASCHE et al. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before this Court are two motions to suppress. One is filed by Defendant Antonio Vitagliano;

the other by Defendant Antonio Fiasche. On February 1, 2006, this Court held a suppression

hearing. This Court has reviewed both the briefing in this case and the testimony at the hearing.

Based on the foregoing reasons, the motions to suppress are both DENIED.

Background

On August 25, 2005, the Kentucky State Police arrested Lars Bjerga ("Bjerga") in

Kentucky after finding approximately 10 pounds of marijuana in his car. After the arrest, Bjerga

told law enforcement officials about two men in the Chicago area. Bjerga said that one of the

men, "Tony", lived in a house near the corner of Maria and Lawrence. Bjerga described the

house as a white brick house with an attached garage in front and a gazebo in the fenced-in

backyard. Bjerga stated that sometime during the week before his conversation with officials, he

had been to the house and given Tony a black briefcase containing approximately $134,000 in

narcotics proceeds.

Bjerga told authorities that Tony and another man would be transporting approximately $500,000 in drug proceeds from Chicago to Syracuse in the near future. The men would transport the money in either Tony's late model black Lexus or a rental car, according to Bjerga. He also provided two telephone numbers that he believed were used by Tony: one was described as "Tony's dope phone" and the other was described as "Tony's home phone."

On September 2, 2005 at approximately 11:00 a.m., a DEA task force officer in Kentucky contacted DEA special agent Traud in Chicago and related the information from Bjerga. DEA agents in Chicago immediately researched the two telephone numbers and determined that "Tony's home phone" was a number belonging to Antonio Fiasche, who lived at 4738 North Maria Court. The other number, "Tony's dope phone", was connected to a pre-paid cellular telephone that did not have any subscriber information.

Based on the subscriber information, authorities established surveillance around noon that day at 4738 North Maria Court in Chicago, a white brick house with an attached garage in the front and a gazebo in the backyard. At approximately 12:30 p.m., they observed a late model black Lexus exit the garage. Some law enforcement officers followed the car, while others stayed behind to observe the house.

The driver of the Lexus–later identified as Antonio Fiasche–drove to a chiropractor's office and the Gottlieb hospital. While Fiasche was out, a grey Chevy Malibu arrived at the house. The driver–later identified as Antonio Vitagliano–parked in the driveway, opened the garage by entering a security code into a keypad attached to it, and entered the house.

Fiasche returned to the house at approximately 1:30 p.m., parked in the garage, and entered the house. About fifteen minutes later, Vitagliano exited. He was carrying a white box

in a manner that one might carry a cake, according to a testifying agent. A brown paper bag was on top of the box. He placed the items on the passenger's side seat of the Malibu and then drove away from the residence.

Authorities followed the car leaving the house. Included in the group was task force office Sobkowiak. Sobkowiak testified at one point he pulled alongside Vitagliano. Through his open window, he observed that Vitagliano appeared to be using a Motorola Razr cell phone. The two men found themselves looking directly at each other, Sobkowiak claims. At that point, according to Sobkowiak, Vitagliano began driving at excessive speeds and began weaving in and out of traffic in an attempt to elude surveillance. Sobkowiak related his observations with respect to the cell phone use to others following Vitagliano.

The officers claim that they were concerned that Vitagliano may have "made them" and that he may have alerted others—especially Fiasche—of the surveillance and so decided to make an investigatory stop at the earliest possible opportunity. Officers in two of the three pursuing vehicles activated their lights and sirens. After the authorities blocked his vehicle, Vitagliano pulled over on Irving Park Road.

Sobkowiak's car was stopped ahead of, and parallel to, the Malibu. He exited his vehicle and began to approach the Malibu. At that point, Vitagliano began to drive forward "at idle speed" in what Sobkowiak perceived was an attempt to drive away by slipping through a gap between Sobkowiak's car and another agent's car that was parked directly in front of the Malibu.

The Malibu stopped briefly and then slowly rolled another car length while Sobkowiak yelled for Vitagliano to put the car in park. Sobkowiak also drew his firearm and held it at ready

-3-

position. He pointed the gun at the Malibu or at the ground. According to the Government, Sobkowiak was the only officer to have a weapon drawn.

As Vitagliano opened the door of the Malibu, the authorities requested that he step out of the car. He complied, and was patted down for weapons. At that point, Sobkowiak's gun was holstered. The authorities then identified themselves and told Vitagliano that they had seen him leave 4738 North Maria Court with packages. The authorities allege that they requested permission to search Vitagliano's car, that he verbally consented, and that he produced his driver's license upon request. They escorted Vitagliano to the back of the Malibu, where he remained while the search was conducted.

During the search of the Malibu, law enforcement officials located a white Hewlett Packard Palm Pilot box on the passenger seat. There was a brown paper bag on top of the box. Two plastic baggies were in the bag. The baggies contained in total over 200 pills: some were orange with the Mercedes Benz logo while others were pink and white. Task police officer Healy asked Vitagliano, "What's in the bag?" Vitagliano replied, "X." The DEA agents understood X to mean ecstasy, a controlled substance. The stop took between one and two minutes. The authorities then took Vitagliano into custody. They put him in Sobkowiak's vehicle and verbally advised him of his Miranda rights. Later, at the Norridge Police Station, Vitagliano was given a written form detailing his Miranda rights. He refused to sign the form. When he was searched at the police station, officers found approximately 14 additional tablets in his pocket.

Vitagliano takes issue with how the Government describes the events.[1] He contends that he did not drive erratically or at high speeds, did not make any calls on his Razr phone between 1:45 p.m. and the time of his arrest, and was more forcibly taken from his car than the Government indicates. He also claims that two officers approached him with guns drawn, rather than one and that he was never asked for nor provided consent to search his vehicle.

This Court finds Sobkowiak's testimony more credible than Vitagliano's regarding the driving style. While phone records of the Razr phone do not show any calls being made between 1:45 p.m. and the time of Vitagliano's arrest, that was not the only phone Vitagliano could have used. Another phone was located in the car; that phone had been used during the time period in question. As for the actual stop, this Court does not find Vitagliano's version of his exit from the car to be credible. Vitagliano claims that he was stopped after a light gray Taurus cut in front of his vehicle and forced him to the right curb lane in a way that he almost struck a parked vehicle. At the same time, a Ford Explorer pulled right next to him and a third vehicle pulled up behind him. Three officers then exited their respective vehicles. Two approached his vehicle, guns drawn, after yelling for him to put his hands up, according to Vitagliano. Only Sobkowiak had a gun drawn, according to the Government, and he put it away when Vitagliano was exiting the vehicle.

---

[1] None of the police reports Sobkowiak generated regarding Vitagliano's arrest contained any information indicating that Vitagliano was talking on a cell phone or noticed Sobkowiak driving next to him. The reports also did not mention that Vitagliano drove in an erratic manner and at a high speed. When recalled to the stand, Sobkowiak testified that he observed Vitagliano with the phone up to ear but did not know if he was speaking on it. During his direct examination, he had testified that Vitagliano "was talking on his cell phone, appeared to be talking on his cell phone."

According to Vitagliano, a third officer then reached into Vitagliano's car window, grabbed him, and tried to pulled him out of the car. The officer then undid Vitagliano's seatbelt and pulled Vitagliano out of the vehicle. He pushed Vitagliano against the Ford Explorer and then started patting him down. According to the Government, Vitagliano opened his car door, law enforcement officials requested that he step out of the car, and he complied. The Government states that the law enforcement officers identified themselves, explained that they had seen him leave 4738 Maria Court with packages, and requested and received his permission to search the vehicle. This Court also finds that Vitagliano was asked for and did give consent for the search of his car.

After finding the drugs, the agents dealing with Vitagliano relayed the events to their counterparts who had remained at Fiasche's house. Once they learned that Vitagliano had figured out he was being followed, had driven erratically, and had been in the possession of over 200 methamphetamine hydrochloride and methylenedioxyamphetamine tablets, the agents at the house decided to make contact with the occupants by carrying out what is referred to as a "knock and talk." At about 2:30 p.m., agents Traud, Walters, and task force officer Arthur approached the front door, knocked, waited 15 seconds before knocking again. They were dressed casually, but wore vests. Arthur's said "police" on the front and had a police symbol on the back. Arthur was standing with his left side to the house and a bay window to his rear. From that position, he heard the blinds of the bay window move within the residence and someone yell "hold on." Arthur then looked through the stained glass n the front door and saw a man with a towel running away from the front door.

-6-

Meanwhile, DEA agent Oko had positioned himself at the northeast corner of the house. He had a view of the side of the house facing Lawrence and was stationed there in order to ensure that no one ran out the side door. As his counterparts at the front door were in the process of contacting the occupants of the house, Oko heard a "swishing" sound. Oko later testified that the swishing noise sounded like someone was trying to run through a screen door. After hearing the noise, Oko ran through what the government concedes was a presumably closed gate into a backyard which was surrounded by a fence and a brick wall. The backyard was empty. Oko surmised someone had escaped by jumping over the rear wood fence. While retracing his steps, he noticed an open patio class door and a torn or shredded screen sliding door. As he inspected the screen door, he heard a flushing sound from a bathroom inside the house.

Special agent Hernandez entered the backyard soon after. She told Oko that they "had" somebody at the front door. Oko then told her that he heard flushing, and asked her to alert the others and get help. Between thirty seconds and a minute later, Oko heard another flushing sound. Soon after, agents entered the house via the screen patio door.

When Oko, Traud, and Walters entered the house, they had their guns out. They yelled "police" and secured the first floor. Arthur and agent Fernandez were let in via the front door. When they opened the door to the basement, the authorities saw Fiasche coming up the stairs, wearing only a towel. At that point, they holstered their firearms. Fiasche was not patted down, but was asked to place his hands on the wall for a second. Afterwards, he was accompanied to the master bedroom to get some clothes.

Arthur, Oko and Fiasche then returned to the kitchen. Arthur and Fiasche sat at the kitchen table, while Oko remained standing. At that point, Arthur identified himself and the

-7-

others and explained why they were in the house. In that atmosphere, which Arthur described as a "controlled calm", he asked Fiasche for consent to search the house. Fiasche verbally provided consent, and read and signed a written consent form. All this occurred within five minutes of the agents entering the house. Fiasche was then immediately advised of his Miranda rights. He signed the advice of rights form at 2:30 p.m., between five and seven minutes after the agents had entered the residence.

After it was determined that Fiasche was educated, could read and write, and was not under the influence of drugs, the agents questioned him. The agents later seized approximately 25,000-27,000 controlled substance tablets. Fiasche told them the tablets were his and he was arrested.

Analysis

As a preliminary matter, both Vitagliano and Fiasche take issue with certain omissions in the agents' reports. While it is true that the agents did not note that Vitagliano was driving erratically or on his cell phone in a criminal report, there was sufficient, credible testimony on those matters at the suppression hearing. The same is true for the facts surrounding the noises in the backyard. Moreover, Defendants do not offer credible evidence that contradicts either set of facts. This Court does not find Vitagliano to be credible in his iteration of the facts as they relate to the chase or his consent and does find Oko to be credible about the noise in the backyard. The Defendants also highlight what they perceive to be factual inconsistences with the Government's case. To the extent that these consistencies are actual and relevant, this Court discusses them below.

*Vitagliano's Motion to Suppress*

Vitagliano raises two arguments in his motion to suppress. The first is that his initial encounter with the police was an arrest without probable cause, rather than an investigatory stop. The second is that the information received by the DEA did not provide reasonable suspicion of criminal activity such that an investigatory stop was justified.

The Seventh Circuit has noted that "[t]he line between a lawful *Terry* stop and an unlawful arrest is not bright." *United States v. Askew,* 403 F.3d 496, 507 (citations omitted). There has been a "multifaceted expansion of *Terry,*" such that "[f]or better or for worse, the trend has led to the permitting of the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention." *Id.* (citation omitted). In *Askew,* for example, the Court of Appeals determined that the FBI executed a constitutional *Terry* stop "even though the agents blockaded Askew's car and approached with guns drawn." *Id.* at 507. The Court of Appeals added that "the inherent danger in stopping those suspected of drug trafficking, for which guns are known tools of the trade, in a public place where civilian lives might be at risk, warranted the level of intrusion in this case." *Id.*

The same applies in this case. Vitagliano points to the fact that the authorities required him to stop, and that he was ordered to show his hands and forcefully removed from his vehicle at gunpoint before the police seized the drugs in his car. The agents in this case had reason to believe that Vitagliano was part of a duo involved in the drug trade. The arrest took place on main street during Labor Day weekend. If Vitagliano had attempted to flee, the potential for harm was great. Therefore, the agents acted reasonably in "neutralizing" Vitagliano by

surrounding his car and approaching with one or two weapons drawn.[2] *See id.* at 508; *see also Lechuga*, 925 F.2d 1035, 1040 (7ᵗʰ Cir. 1991)(collecting authority supporting conclusion that circumstances where weapons are drawn and vehicles are blocked in order to effectuate a stop can be classified as *Terry* stops). Vitagliano does not distinguish these cases, or provide this Court with others that would support a characterization of the initial encounter as an arrest.

The key question with respect to Vitagliano is whether the authorities' actions in stopping Vitagliano's vehicle constituted a proper investigatory stop under *Terry v. Ohio*, 392 U.S. 1 (1968). A *Terry* stop is "brief detention which gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, or is about to be engaged in criminal activity." *United States v. Smith*, 3 F.3d 1088, 1095 (7ᵗʰ Cir. 1993)(citation omitted). As the Seventh Circuit has noted, "[s]ince the Supreme Court's decision in *Terry*, it has been established that a law enforcement officer may conduct a brief, non-intrusive detention of the person if the office has specific and articulable facts sufficient to give rise to a reasonable suspicion that the person had committed or is committing a crime." *United States v. Sheets*, 188 F.3d 829, 837 (7ᵗʰ Cir. 1999). Courts consider the"the totality of circumstances known to the officers at the time of the stop" which include "the experience of the law enforcement agent and the behavior and characteristics of the suspect." *U.S. v. Swift*, 220 F.3d 502, 506 (7ᵗʰ Cir. 2000)(citation omitted). When evaluating the reasonableness of an investigatory stop, courts first determine whether the officers' actions were justified at the inception of the stop and next determine whether the stop was

---

[2] This Court concludes that the question of whether one weapon was drawn or two is immaterial. In *Askew*, for example, more than one agent had a weapon drawn. *Askew,* 403 F.3d at 507.

-10-

reasonably related in scope to the circumstances which justified the stop in the first place. *See id.* (citing *Smith,* 3 F.3d 1088).

Vitagliano argues that the agents did not have specific enough information about him such that a *Terry* stop was justified. In support, he notes that he was not specifically identified by Bjerga, was not driving a rental car or older model Lexus, and could not have been carrying $500,000 in cash as he exited the house. The information the DEA had only related to Fiasche, Vitagliano contends, and therefore did not provide predictive information such that the stop was justified.

This Court disagrees. While it is true that Bjerga did not provide much in the way of specific information about Vitagliano, much of what he did say was corroborated. Bjerga said that a second male would be accompanying Tony on the drive. Vitagliano fit that description: he was male and he did arrive at a time when Fiasche and another male were alleged to be planning their drive. The fact that he was driving a Malibu and not a rental car or an older model Lexus is also not dispositive. *See U.S. v. Askew* (upholding finding of reasonable suspicion when defendant was stopped in car other than the car he was expected to be driving). Bjerga's information was dated, and it was entirely possible that the men could have changed the car they would take or decided to meet at a different location where they would then take a car that Bjerga had identified. As for the cash, under Vitagliano's approach, the agents would not have been justified in stopping anyone who was not possibly transporting $500,000. This Court does not believe that such a showing is required. For example, Vitagliano could have been carrying a portion of the money being transported because he had already obtained or was planning on later

obtaining the rest of it, or the men could have changed the amount that they would be transporting.

When the agents observed Vitagliano leaving the house with two packages, they had already found their tipster–a person who was not anonymous and in fact claimed to have a business relationship with the man named Tony who lived at the North Maria Court house–was right about many details. When they went to the address he gave them, they found the house there exactly as described. The phone numbers linked to a number belonging to Antonio Fiasche, an individual likely to be called "Tony", and an unlisted pre-paid number of the sort that one might obtain if one was engaged in the drug trade. A man left the house in an older model black Lexus, the type of car that Bjerga had described as being a possible vehicle used in the Syracuse trip. When Vitagliano showed up, he proceeded directly into the house. He came back after meeting with Fiasche. He was carrying packages.

The Government, in support of a finding of reasonable suspicion, relies on *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995). In *Vega*, agents stopped a man who drove into a garage that was housing 500 kilograms of cocaine, spent ten minutes in the garage and out of view, and then drove out. The Seventh Circuit concluded that there was reasonable suspicion for the stop and noted that the agents both knew that there was cocaine in the garage and observed the defendant driving into the garage and back out in ten minutes. The factual differences between Vega and this case do not necessitate a different outcome. In *Vega*, the agents knew that there was cocaine in the garage because they had arranged the transaction. In this case, the agents were not certain that either drugs or money from drug transactions were in the house. What they did know at that point, however, was sufficient to justify a *Terry* stop. They knew that their source's

-12-

information had been quite reliable up until that point and they knew that the male who went into Fiasche's house and came out carrying packages could have been carrying either drugs or money from drug dealing.

Vitagliano does not argue–and this Court does not find facts to support the conclusion–that the degree of intrusion was not reasonably related to the circumstances which justified the interference in the first place. *See Vega*, 72 F.3d at 515. As this Court noted earlier, the circumstances involved stopping Vitagliano, an individual suspected to be involved in the drug trade, in a public place. Moreover, this Court finds the Government's iteration of the facts surrounding the stop and later arrest more credible than Vitagliano's to the extent that such credibility determinations factor into the analysis. Vitagliano's claim that an agent reached into the car window and attempted to pull him out through the window, for example, is not compelling.

*Fiasche's Motion to Suppress:*

Fiasche contends that there were no exigent circumstances that supported the agents' entry into his home. He is correct that a warrantless search of a home is presumptively unconstitutional. *Payton v. New York*, 455 U.S. 573 (1980). A warrantless entry is permissible, however, when probable cause and exigent circumstances exist. *See United States v. Marshall*, 157 F.3d 477, 482 (7th Cir. 1998). Exigent circumstances are found when "there is a compelling need for official action and no time to secure a warrant." *Id.* (citations omitted). The government bears the burden of proving that exigent circumstances existed at the time of entry. *Id.* Courts do not ask what the police could have done, but rather "whether they had, at the time

-13-

a reasonable belief that there was a compelling need to act and not time to procure a search warrant." *Id.* When law enforcement officials seek to justify their entry based upon a risk of imminent destruction of evidence, as they do in this case, they must show that the facts as they appeared at the moment of entry would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured. *See id.* (citations omitted)).

After reviewing the totality of circumstances in this case, this Court concludes that warrantless entry was permissible. "Probable cause exists if under the totality of circumstances it was reasonable for the officer to believe that a particular individual had committed a crime." *United States v. Evans*, 27 F.3d 1219, 1228 (7th Cir.1994). Whether probable cause exists is a "practical, common sense determination" based on all the circumstances known to the officer at the time. *See United States v. Valencia*, 913 F.2d 378, 382 (7th Cir.1990). Agents had been told by an informant who was a business partner of "Tony" that he was involved in the drug trade. That source was reliable: the house was just as he described, the home phone number did indeed belong to someone whose name could easily be shortened to Tony, and a male at the house had access to a black, older model Lexus. The agents saw two men enter the house. One of the men left after a brief time. When he left, he was carrying two packages. The shortness of his stay made it likely that he entered the house so that he could pick up those packages. When agents stopped him and obtained consent to search the packages, they discovered that the packages contained drugs. At that point, it was reasonable for the agents to believe that both drugs and drug money were passing through the Maria Court address.

The evidence also shows that the agents had an objectively reasonable basis, given the totality of circumstances, to believe that exigent circumstances existed. After gathering

-14-

information about Vitagliano's stop and arrest, several agents situated themselves around the house. Some began to carry out a "knock and talk." Oko positioned himself on or near a sidewalk on the side of the house, so he could make sure that no one ran out the side door. While standing there, he heard a "swishing" sound that caused him to run to the rear of the house.[3] He entered the backyard, in order to prevent anyone from escaping.

While the backyard was a protected area, *see United States v. Shanks*, 87 F.3d 977, 979 (7th Cir. 1996)(citation omitted), Oko's entry was justified. He knew that the other agents were in the process of contacting the occupants of the house, a house that had been described accurately by the informant and had at one point contained the drugs that were apprehended when Vitagliano was stopped. When he heard the noise, he thought that someone had exited the from the house. He ran back, and saw a broken screen. He then heard a flushing sound. At that point, he learned that contact had been made in front. Then he heard another flush. The sound of flushing, accompanied by the understanding that the occupants were aware of police presence, created exigent circumstances. Oko could have reasonably believed that Fiasche, alerted to police presence, was flushing evidence in order to destroy it.

Fiasche argues that any suggestion that he was aware of Vitagliano's arrest is "laughable" because Vitagliano did not tell police that Fiasche expected him to return and did not see him arrested. This Court does not agree that the only way Fiasche could have gotten news of the arrest was if Vitagliano called him. Vitagliano did make or receive a call on a cell phone prior to his arrest: that call could have alerted someone–either Fiasche or one of Fiasche's sources–that

---

[3] At the hearing, Oko testified "the way I perceived it is somebody ran through that screen door and ran out of the house. That's what I was thinking at the time." This Court finds Oko's testimony describing the incident to be credible.

Vitagliano was being followed by agents. *See U.S. v. Mikell* 102 F.3d 470, 476 (11th Cir. 1996)(upholding finding of exigent circumstances when authorities who had seen defendant talking on a cellular phone while being pursued and believed that someone remained in apartment in question concluded that defendant could have been instructing that person to destroy the cocaine and other related evidence located in the apartment.). Moreover, an occupant of the house was informed that law enforcement was outside the house when they began the knock and talk while wearing their vests. Even without knowing that Vitagliano had been arrested, the individual who saw the law enforcement agents could have determined that it was the right time to destroy the drugs.[4]

Fiasche argues that Oko's sweep was not appropriately limited, that the hole was too small for a person to exit through, and that someone could not have jumped the fence in the time it took Oko to get to the backyard. That may be the case, but omniscience is not required. Having heard the sound, and having surmised that someone had run through the screen door, Oko was justified in entering through the closed case and surveying the back yard and the broken screen door. It was during his inspection of the screen door that he heard the flushing. The flushing, combined with knowledge that someone in the house was most likely aware of police

---

[4] The Government also relies on *United States v. Rivera*, 825 F.2d 152 (7th Cir. 1987). In *Rivera*, the Seventh Circuit held that exigent circumstances could be supported by a "fear that a fourth or fifth conspirator might be inside the room, ready to destroy the evidence [drugs] if his or her compatriots did not return as planned." *Id.* at 156. In this case, by comparison, the authorities did not believe there to be exigent circumstances at the outset and instead opted to try the knock and talk approach. It was only when Oko heard what he thought might have been someone trying to escape that he entered a protected area. That entry, as noted, was proper because of exigent circumstances.

presence, was sufficient to create exigent circumstances such that warrantless entry was permitted.

Fiasche also contends that there was no valid consent for the search. Once the authorities had legally entered the house under exigent circumstances, "a subsequent search or seizure of items in the room must be justified by a warrant or an exception to the warrant requirement." *United States v. Rivera*, 825 F.2d 152, 157 (7th Cir. 1987). In this case, the Government states that Fiasche consented to the search. Whether consent is voluntary is a factual question that "depends on the totality of the circumstances." *United States v. Cellitti*, 387 F.3d 618, 622 (7th Cir. 2004). In this case, the authorities did not carry out a search of the house until after obtaining Fiasche's written consent.

Courts review several factors when determining the voluntariness of a defendant's consent, including: "(1) the person's age, intelligence, and education[;] (2) whether he was advised of his constitutional rights[;] (3) how long he was detained before he gave his consent[;] (4) whether his consent was immediate, or was prompted by repeated requests by the authorities[;] (5) whether any physical coercion was used[;] and (6) whether the individual was in police custody when he gave his consent." *United States v. Santiago,* 428 F.3d 699, 704-705 (7th Cir.2005) (quoting *United States v. Raibley,* 243 F.3d 1069, 1075-1076 (7th Cir.2001)). A review of the totality of the circumstances surrounding Fiasche's signing of the consent form–he signed after authorities had explained the situation to him without using any physical coercion and within five minutes of their entering his residence–lead this Court to find credible the assertion that Fiasche's consent was freely and voluntarily given.

Fiasche counters that the consent was invalid because the entry was illegal. Fiasche's reliance on *Brown v. Illinois*, 422 U.S. 590 (1975) and *United States v. Jerez*, 108 F.3d 684 (7th Cir. 1997) is misplaced: the search in this case did not occur pursuant to illegal conduct. As this Court noted earlier, the authorities were justified in entering the house without a warrant because of exigent circumstances. Fiasche also argues that authorities, in carrying out their protective sweep of the house before obtaining consent, violated the Fourth Amendment. The sweep in this case–which took a minute or two–was limited to clearing and securing the premises. The sweep was limited in nature and intended to protect the authorities; as such, it was reasonable. *See U.S. v. Blackwell*, 416 F.3d 631, 632 (7th Cir. 2005)(noting instances where a protective sweeps have been found reasonable).

Fiasche also argues that his consent is invalid because it preceded a *Miranda* warning. In support, he cites *United States v. Johnson*, 415 F.3d 728 (7th Cir. 2005). Fiasche does not explain how *Johnson* helps his case: he offers no analysis or more specific citation. In *Johnson*, the Seventh Circuit on plain error review affirmed the district court's decision to deny a motion to suppress when the police engaged in a series of questions with the defendant without informing him of his rights under Miranda. Interrogation is defined as "any words or actions on the part of the police (other than those normally attendant to arrest and questioning) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 731 (citing *Rhode Island v. Innis,* 446 U.S. 291, 301 (1980) (footnote omitted)). In this case, no interrogation occurred before Fiasche was advised of his *Miranda* rights: the statements that the government seeks to introduce all took place after Fiasche was advised of his *Miranda* rights. As with the consent to search, this Court concludes that the statements were made voluntarily.

## Conclusion

For the foregoing reasons, both motions to suppress are DENIED.

Enter:

David H. Coar
United States District Judge

Dated: **March 10, 2006**

U.S. DISTRICT COURT

2006 MAR 10 PM 2: 12